# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: |
| v. | : | DATE FILED: _____ |
| BRYAN ELON JACKSON | : | VIOLATION: |
| | | 18 U.S.C. § 1349 (wire fraud |
| | : | conspiracy – one count) |
| | | Notice of forfeiture |
| | : | |

## INFORMATION

## COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

## BACKGROUND

1.    Defendant BRYAN ELON JACKSON was a resident of Big Bear City, California, and was the purported owner of "shelf" or "dormant" companies named Gallio LLC ("Gallio") and Medic Core LLC, also known as Medicore and Med Icore ("Medic Core").  Shelf companies existed only on paper; these companies had no functioning business and no employees.

2.    Co-conspirator A, deceased and previously charged elsewhere, was a resident of Celebration, Florida.  Co-conspirator A owned and operated Guardian Angel Associates, LLC ("Guardian Angel"), a tax preparation company, from in or about December 2011 to in or about November 2021.  Co-conspirator A prepared and filed federal and state income tax returns and other tax documents for clients and himself with the Internal Revenue Service (the "IRS") and assisted clients with loan applications that were submitted to financial institutions, non-bank lenders, and financial technology companies.  Co-conspirator A's clients

included individuals and small businesses from around the country, including California, Georgia, Florida, Texas, and elsewhere.

3. Frank Hamilton, charged elsewhere, was a resident of Simi Valley, California, and was the owner of multiple shelf and dormant companies registered in California, including Berkeley Marketing Group, Inc. ("BMG"), KLMN Little Hands, and Historic Concepts LLC ("Historic Concepts"). Hamilton also acted as the owner of Nubela USA, Inc. ("Nubela"), a functioning company with little actual revenue and few actual employees. In addition, Hamilton assisted other individuals in obtaining loans from financial institutions, non-bank lenders, financial technology companies, and others as described in greater detail below.

4. Michael Jones, charged elsewhere, was a resident of Azusa, California, and was the purported owner of a shelf company registered in California, Foxtrot Systems, LLC ("Foxtrot"). In addition, Jones assisted other individuals in obtaining loans.

5. Kenny Tran, charged elsewhere, was a resident of Rosemead, California, and was the purported owner of a shelf company registered in California, Hornet LLC ("Hornet"), and owned another California-based company, Trans Logistics LLC ("Trans Logistics"), which had limited business operations and only one employee.

6. Tina Chen, charged elsewhere, was a resident of Los Angeles, California, and was the purported owner of two shelf companies registered in California, Minnow LLC ("Minnow") and Definito LLC ("Definito").

7. Timothy Park, charged elsewhere, was a resident of Los Angeles, California, and was the purported owner of a shelf company registered in California, Tiburon LLC ("Tiburon"), as well as two other California-based companies, Boostmore LLC

("Boostmore") and BME Bikes LLC ("BME Bikes"), both of which had limited business operations and no more than one employee at any time.

8.    Peter An, charged elsewhere, was a resident of Chatsworth, California, and was the purported owner of a shelf company registered in California, Authora LLC ("Authora").

9.    Joseph Greco, charged elsewhere, was a resident of Simi Valley, California, and was the purported owner of a shelf company registered in California, Aprise LLC ("Aprise").

10.    Edwin Bonilla, charged elsewhere, was a California resident, and was the purported owner of a shelf company registered in California, Domino Group LLC ("Domino Group").

11.    Leslie Murray, charged elsewhere, was a California resident, later a resident of Henderson, Nevada, and was the purported owner of a shelf company registered in California, Xoom Asset Management LLC ("Xoom")

12.    Le Chu Valdivia, charged elsewhere, was a resident of Simi Valley, California, and later Maricopa, Arizona, and was the purported owner of a shelf company registered in California, Citizo Inc. ("Citizo").

### The Small Business Administration

13.    The Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by

enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

*The SBA's 7(a) Loan Program*

14.    The SBA's pre-pandemic loan program was designed to assist small businesses and offered pursuant to Section 7(a) of the Small Business Act of 1953 loans to small businesses that might not otherwise obtain financing on reasonable terms and conditions ("7(a) Loans").  These loans were funded by lenders qualified by the SBA, and the SBA would partially guarantee the loan for applicants approved by the SBA.  In order to obtain a 7(a) Loan, a qualifying business was required to submit a 7(a) Loan application signed by an authorized representative of the business.  The 7(a) Loan application required the small business to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the 7(a) Loan and to determine the amount of the loan, including certifications regarding: (i) the number of employees; (ii) "total average annual receipts" for the business's latest three complete fiscal years (which are normally found on IRS tax forms); (iii) a demonstrated need for the loan proceeds; (iv) promised use of the funds for a sound business purpose; and (v) no delinquency on any debt obligations to the U.S. government.

**The CARES Act**

15.    The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

*Paycheck Protection Program*

16.     One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or about April 2020, Congress authorized over $300 billion in additional PPP funding.  In or about December 2020, Congress expanded and extended the PPP to March 31, 2021, and authorized over $280 billion for additional initial PPP loans for first-time PPP borrowers, as well as second PPP loans ("PPP Second Draw") for smaller and harder hit businesses.  On or about March 30, 2021, as a result of ongoing economic challenges faced by small businesses, Congress again extended the PPP to May 31, 2021.

17.     To obtain an initial PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation (generally, a business tax return) to substantiate their payroll expenses.

18.     PPP loan applications were processed by a participating financial institution (the lender).  If the lender approved a PPP loan application, the lender funded the PPP loan using its own monies, which were 100 percent guaranteed by the SBA.  Data from the

application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

19.     Certain PPP lenders provided loan applicants with access to an online PPP portal and offered eligible participants funding through their own customized platforms.  Other brick-and-mortar banks partnered directly with non-bank lenders and financial technology companies to identify, assist, and fund eligible PPP applicants.

20.     As part of the PPP, businesses were required to use PPP loan proceeds on certain permissible expenses, including, among others, payroll costs, interest on mortgages, rent, and utilities.  Additionally, Congress provided for loan forgiveness on the interest and principal of the PPP loan if the business spent the loan proceeds on these expense items within a designated period of time (initially within eight weeks of receiving the proceeds, which period was later extended to twenty-four weeks).  Prior to June 5, 2020, borrowers were required to use at least 75 percent of the PPP loan proceeds on payroll expenses in order to qualify for forgiveness.  After that date, the percentage required to be spent on payroll was lowered to 60 percent.

21.     A PPP Second Draw loan allowed certain borrowers with 300 employees or fewer that previously received a PPP loan to receive a second loan on the same general loan terms as their first PPP loan.  To obtain a PPP Second Draw loan, a qualifying business was required to submit a PPP Second Draw loan application that was signed by an authorized representative of the business.  Like the initial PPP application, a PPP Second Draw loan application required the business (through its authorized representative) to acknowledge the

program rules and make certain affirmative certifications in order to be eligible to obtain the PPP

loan, including with respect to its average monthly payroll expenses and number of employees.

Applicants were required to substantiate these payroll figures, typically by submitting tax

returns, which were used to calculate the amount of money the small business was eligible to

receive.  Additionally, in the PPP Second Draw loan application, the small business was required

to demonstrate, among other things: (a) that it previously received a "first draw" PPP loan and

would use (or had used) the full amount only for authorized uses, as described above; and

(b) that it had experienced at least a 25 percent reduction in gross receipts between comparable

quarters in 2019 and 2020.

*The EIDL Program*

23.    Another source of relief provided by the CARES Act was the expansion

of the SBA's Economic Injury Disaster Loan ("EIDL") program, which was created before the

COVID-19 pandemic and was expanded to address small business owners' needs during the

pandemic.  Specifically, the CARES Act authorized the SBA to provide EIDL loans of up to $2

million to eligible small businesses experiencing financial disruption due to the COVID-19

pandemic.  The CARES Act also authorized the SBA to issue advances of up to $10,000 to small

businesses within three days of applying for an EIDL ("EIDL Advances").  The amount of the

EIDL Advance was determined by the applicant's number of employees, which the applicant had

to certify.  The EIDL Advances did not have to be repaid.

23.    To obtain an EIDL and an EIDL Advance, a qualifying business was

required to submit an application to the SBA and provide information about its operations, such

as its number of employees, its gross revenues for the 12-month period preceding the disaster,

and its cost of goods sold in the 12-month period preceding the disaster. The applicant was also required to certify that the information in the application was true and correct to the best of the applicant's knowledge.

### Financial Institutions, Lenders, and Service Providers

24. Customers Bank was a financial institution, FDIC number 34444, headquartered in Phoenixville, within the Eastern District of Pennsylvania

25. First Home Bank, now Bay First Bank, was a financial institution, FDIC number 34997, headquartered in St. Petersburg, Florida.

26. U.S. Bank National Association was a financial institution, FDIC number 6548, headquartered in Cincinnati, Ohio.

27. Cross River Bank was a financial institution, FDIC number 58410, headquartered in Teaneck, New Jersey.

28. Northeast Bank was a financial institution, FDIC number 19690, headquartered in Portland, Maine.

29. Bancorp was a financial institution, FDIC number 8117, headquartered in Wilmington, Delaware.

30. Celtic Bank was a financial institution, FDIC number 57056, headquartered in Salt Lake City, Utah.

31. Bank of America, N.A. was a financial institution, FDIC number 17438, headquartered in Charlotte, North Carolina.

32. West Town Bank and Trust was a financial institution, FDIC number 28157, headquartered in North Riverside, Illinois.

33.    The deposits of the banks described in paragraphs 24 through 32 of this count were insured by the Federal Deposit Insurance Corporation, and these banks were authorized by the SBA to participate in the PPP as lenders to small businesses.

34.    Bluevine Capital Inc. ("Blue Vine") was a non-bank lender and financial technology company headquartered in Redwood City, California.

35.    American Express Kabbage Inc. ("Kabbage") was a non-bank lender and financial technology company headquartered in Atlanta, Georgia.

36.    Fountainhead Commercial Capital ("Fountainhead") was a non-bank lender headquartered in Lake Mary, Florida.

37.    Newity LLC (formerly ACAP) ("Newity") was a non-bank lender headquartered in Chicago, Illinois.

38.    Blue Vine, Kabbage, Fountainhead, and Newity participated in the SBA's PPP by, among other things, acting as service providers between small businesses and certain lenders.  Small businesses seeking a PPP loan were able to apply through these companies, which reviewed the PPP loan applications.  If a PPP loan application received by one of these companies was approved for funding, a partner lender, such as the banks described in paragraphs 24 through 32 of this count, disbursed the loan funds to the applicant.

39.    Blue Vine, Kabbage, Fountainhead, and Newity were authorized by the SBA to participate in the PPP as non-bank lenders to small businesses.

9

**THE CONSPIRACY**

40.    From in or about June 2017 through in or about May 2023, in the Eastern District of Pennsylvania and elsewhere, defendant

**BRYAN ELON JACKSON**

knowingly and intentionally conspired and agreed with Co-conspirator A, deceased, and Frank Hamilton, Michael Jones, Kenny Tran, Timothy Park, Tina Chen, Peter An, Joseph Greco, Edwin Bonilla, Leslie Murray, and Le Chu Valdivia, each charged elsewhere, and other persons known and unknown to the United States Attorney to devise and intend to devise a scheme and artifice to defraud the SBA and the financial institutions and companies named in paragraphs 24 through 32 and 34 through 37 in this count, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343.

**MANNER AND MEANS**

It was a part of the conspiracy that:

41.    Defendant BRYAN ELON JACKSON and Co-conspirator A, Frank Hamilton, Michael Jones, Kenny Tran, Timothy Park, Tina Chen, Peter An, Joseph Greco, Edwin Bonilla, Leslie Murray, Le Chu Valdivia, and their conspirators conspired to defraud multiple federally-insured banks, financial technology companies, non-bank lenders, and the SBA by knowingly applying for and obtaining SBA loans for which they did not qualify.

42.    The purpose of obtaining these loans was for the conspirators' investment and personal use rather than the business purposes required by the SBA for loan recipients.  The conspirators obtained these loans through the use of false and misleading information.  The conspirators directed most of the proceeds of the loans to Frank Hamilton, who pooled these funds into investment accounts to enable the conspirators to pursue more investment opportunities and seek greater returns.  The conspirators generally arranged payments to and from various business accounts controlled by Hamilton so that, when combined with their false statements, the payments fraudulently appeared to be employee payroll from one of Hamilton's companies, loans to one of Hamilton's companies, or other business transactions.

43.    Defendant BRYAN ELON JACKSON, Co-conspirator A, Frank Hamilton, Michael Jones, Kenny Tran, Timothy Park, Tina Chen, Peter An, Joseph Greco, Edwin Bonilla, Leslie Murray, Le Chu Valdivia, and other conspirators took multiple steps to fraudulently obtain SBA loans, including the following:

a.    Co-conspirator A prepared false loan applications and supporting documents for other individuals.  Frank Hamilton and Michael Jones used these false documents not only to submit their own fraudulent loan applications, but also to assist defendant BRYAN ELON JACKSON, Kenny Tran, Timothy Park, Tina Chen, Peter An, Joseph Greco, Edwin Bonilla, Leslie Murray, Le Chu Valdivia, and others in submitting fraudulent loans applications. The purpose of these applications was to obtain funds for the personal and investment use of the conspirators rather than for the business purpose claimed in the applications.

b.    Frank Hamilton and Michael Jones assisted conspirators who did not have an existing business with which to apply for a loan, usually by arranging for the

conspirator to purchase a shelf company, or in some instances by giving a conspirator a shelf company. This type of company exists only on paper; these companies have no functioning business and no employees. The originators of shelf companies filed all necessary paperwork and paid all fees required to keep the companies active and registered with the relevant state authority. After holding these companies for several years, the originators of the shelf companies sold them to individuals who needed to have a company that appeared to have been in business for several years in order to qualify for loans or for other purposes.

c.      Frank Hamilton provided defendant BRYAN ELON JACKSON with the shelf companies Gallio and Medic Core, which had no operations or employees.

d.      In some instances, conspirators used an existing business, which either was not functioning or did not otherwise qualify for the loan for which the conspirator was applying, to submit the fraudulent loan applications.

e.      In most instances, conspirators opened corporate bank accounts in the names of the shelf companies. In many instances, the conspirators paid a fee to Frank Hamilton and Michael Jones to have websites, telephone numbers, and emails created for their shelf companies to make them appear to be legitimate businesses. Also, at various times defendant BRYAN ELON JACKSON and Kenny Tran, Tina Chen, Timothy Park, Peter An, Joseph Greco, Edwin Bonilla, Leslie Murray, and Le Chu Valdivia gave Co-conspirator A, Hamilton, and Jones access to their personal and financial information so that Co-conspirator A, Hamilton, and Jones could assist them in the loan application process.

f.      Among other things, the fraudulent loan applications that Co-conspirator A prepared for the conspirators falsely stated the length of time that the company

12

was in business, the nature of the business, the revenues and expenses of the business, the number of employees of the business, the business' payroll expenses, and the purpose for which the loan would be used. In the few instances when a conspirator used an existing business to apply for a loan, the loan application falsely reflected much higher revenue and far more employees than the companies' actual revenue and employees. Co-conspirator A sent the completed paperwork either directly to the applicant or to Frank Hamilton and Michael Jones, who worked with applicants, including defendant BRYAN ELON JACKSON, to make the actual submission of the fraudulent applications.

g.      Co-conspirator A usually provided a script to co-conspirators who were applying for PPP loans to use during calls with lenders. At times, Frank Hamilton and Michael Jones listened in on calls between the applicants and the banks so that they could text directions to the co-conspirators on how to respond to the banks' questions if necessary.

h.      Conspirators sometimes applied to several lenders at approximately the same time. Due to SBA requirements, only one loan could be funded for each type of SBA loan. Although many loans were rejected, most of the businesses that applied received at least one funded loan, and many received several loans, including multiple types of loans for more than one business.

i.      In some cases, after Co-conspirator A learned that some lenders were checking with the IRS to see if the company applying for the loan had actually filed taxes, Co-conspirator A prepared fake tax returns for the companies and had the co-conspirators take the returns to an IRS service center to have the return filed and stamped as received by the IRS

13

so the returns could be provided to the lender.  For many loans, however, no returns were filed with the IRS, and fake returns were only sent to lenders.

j.      Conspirators generally paid Co-conspirator A upfront fees to get the loan application started, and Co-conspirator A often received an additional "success fee" after the loan funds were received.  In addition, Frank Hamilton and Michael Jones, who helped recruit and assist co-conspirators through the process, collected fees for their work.

k.      Frank Hamilton and Co-conspirator A obtained email updates from conspirators to track their loan application progress.

l.      Frank Hamilton, Michael Jones, and Co-conspirator A used the names of other conspirators and their businesses on loan applications to assist with the application process.

m.      For 7(a) loans, the purpose of the scheme was to have Frank Hamilton use the money to invest in the stock market on the conspirators' behalf.  For this reason, after receiving loan proceeds, the loan applicants, including defendant BRYAN ELON JACKSON, normally kept a small percentage of the money that they received for the loans, and gave the rest of the proceeds to Hamilton for the purpose of having him invest the money in the stock market on their behalf.  For 7(a) loans, Hamilton then sent the applicants a monthly stipend, which was sufficient to make their monthly payments to the SBA or the lending bank, plus a small additional amount for the applicants' personal use.

n.      For EIDL loans, Frank Hamilton applied for these loans in the names of the conspirators' businesses and kept all of the money.  The proceeds of these EIDL loans were directed to Hamilton, who was also responsible for making the loan payments.

14

o.      For PPP loans, the conspirators planned to apply for loan forgiveness, and also to apply for a second PPP draw.  In order to meet the SBA requirement for PPP loan forgiveness and a second PPP draw, applicants were required to show that certain percentages of the loan funds were or would be used for payroll.  For this reason, Co-conspirator A provided Frank Hamilton and Michael Jones with fake payroll schedules outlining the amounts that should be documented as payroll expenses, often in amounts exceeding $10,000, for the applicants' companies that obtained PPP funds.  Using these schedules, Hamilton and Jones instructed defendant BRYAN ELON JACKSON, Kenny Tran, Tina Chen, Timothy Park, Peter An, Joseph Greco, Edwin Bonilla, and Leslie Murray to transfer portions of the fraudulent PPP loan proceeds that they had received to Historic Concepts LLC, a business account controlled by Hamilton, on a bi-weekly basis and to include a memo on the wire transfer stating "payroll."  These transfers were intended to give the false impression that the companies were actually paying bi-weekly payroll, even though the companies had no employees and no wages would be paid to anyone.  These transfers were made for the purposes of avoiding detection and increasing the likelihood that the conspirators would qualify for a PPP Second Draw loan and for loan forgiveness.  It was intended that Hamilton would hold most of the funds transferred as "payroll" until the SBA granted forgiveness of the PPP loans.

p.      Co-conspirator A and Frank Hamilton supplied conspirators with fake employee lists, fake contractor Form 1099s, and fake business invoices in the names of businesses owned by conspirators to use on the loan applications and for use as back-up documents if requested by lenders as proof that conspirators' businesses had employees, contractors, and vendors.  At times, the conspirators agreed to have funds wired to accounts that

15

they controlled, after which they would return the funds to an account provided by Co-conspirator A or Hamilton. Conspirators then provided bank receipts that showed the receipt of the funds by Hamilton or Co-conspirator A, who altered the receipts to make it falsely appear to the banks that funds had been received by the purported vendor.

*7(a) Loans*

44.     On or about August 11, 2017, defendant BRYAN ELON JACKSON, after discussing with Frank Hamilton the process of submitting loan applications using a shelf company to obtain a loan for businesses that had no operations, employees, vendors, or income to obtain a fraudulent 7(a) loan, filed an application with Celtic Bank for a $150,000 loan for his non-operational shelf company Gallio. The application, which was prepared by Co-conspirator A, falsely stated that the purpose of the loan was for working capital, that the company performed IT consulting services, that it had been in business since 2014, that it had gross sales the previous year of $751,640, and that at the time of the application, it had three employees and three additional jobs would be created with the loan proceeds. Defendant JACKSON filed this application, knowing that the plan was for Hamilton to receive the majority of the loan proceeds, invest those proceeds on behalf of defendant JACKSON along with the loan proceeds that he received from other conspirators, and send defendant JACKSON and other conspirators enough money monthly to make their loan payments and a small additional amount for defendant JACKSON'S personal use.

45.     On or about September 15, 2017, defendant BRYAN ELON JACKSON received approximately $148,245, after fees, for his Gallio 7(a) loan from Celtic Bank. Defendant JACKSON then sent the funds to an account at Bank of America at the direction of

Frank Hamilton so that Hamilton could use the funds, along with the funds other conspirators obtained from the fraudulent loans that Hamilton and Co-conspirator A had assisted them in obtaining, to invest in the stock market. Also, in accordance with their plan, Hamilton sent defendant JACKSON sufficient funds to make monthly loan payments and a small additional sum for defendant JACKSON's personal use.

46. On or about December 7, 2018, defendant BRYAN ELON JACKSON applied for a 7(a) loan from First Home Bank for his non-operational shelf company Medic Core. The application requested $250,000 for working capital. The type of business was listed as medical billing and administration services. The application falsely stated that the purpose of the loan was for working capital, that the company performed IT consulting services, and that it had one employee and would hire an additional employee with the loan funds. None of these statements were true, as the company had never had any business operations of any kind, and it had no employees.

47. On or about March 5, 2019, defendant BRYAN ELON JACKSON received approximately $243,405.50, after fees, from First Home Bank for a 7(a) loan for his company Medic Core.

48. On or about March 7, 2019, defendant BRYAN ELON JACKSON sent approximately $232,000 of his Medi Core 7(a) loan proceeds to Frank Hamilton's company Berkeley Marketing Group. The actual purpose of the transfer was for Hamilton to invest the money in the stock market, generate returns, and make monthly payments to defendant JACKSON.

49.     On or about March 13, 2019, Frank Hamilton sent defendant BRYAN ELON JACKSON an email saying "here are the notes and invoices we discussed."  The email included the following promissory notes and invoices for Gallio and Medic Core.  The purpose of the invoices and notes was to create the false impression that the transfer of 7(a) funds between defendant JACKSON and Hamilton was for legitimate business purposes:

a.    A September 15, 2018 invoice from Hamilton's Berkeley Marketing Group company to Gallio falsely listed charges totaling approximately $22,500 in fees for entity structure, CPA filings fees, and business consulting fees.

b.    A March 15, 2019 invoice from Hamilton's Berkeley Marketing Group company to Medic Core falsely listed charges totaling approximately $48,000 for entity structure, CPA filings fees, and business consulting fees.

c.    A March 16, 2019 promissory note for approximately $143,177.50 stating that Hamilton's company Nubela had agreed to repay defendant JACKSON's company Gallio at an interest rate of 9.4%.

d.    A March 16, 2019 promissory note for approximately $184,000 stating that Hamilton's company Nubela agreed to repay defendant JACKSON's company Medic Core at an interest rate of 9.4%.

50.     From in or about February 2018 through in or about November 2019, defendant BRYAN ELON JACKSON's co-conspirators, most of whom knew one another, also fraudulently applied for and obtained 7(a) loans, using shelf companies, or in some instances

existing companies, knowing that the purpose of the loans was not for the benefit of these companies, but rather was to have Frank Hamilton invest those funds in the stock market on the conspirators' behalf. During this period, Hamilton applied for a 7(a) loan for his company Nubela from First Home Bank; Michael Jones, Timothy Park, and Le Chu Valdivia all applied for and received 7(a) loans for one of their companies from First Home Bank; Kenny Tran applied for and received a 7(a) loan from West Town Bank; and Tina Chen applied for and received a 7(a) loan from Bancorp, all using fraudulent applications provided by Co-conspirator A. Like defendant JACKSON, Park, An, Tran, and Chen all sent the majority of the proceeds of the loans to Hamilton to invest in the stock market on the conspirators' behalf rather than for the purposes stated on their loan applications.

*PPP Loans*

51. On or about May 11, 2020, after having discussing PPP loans with Frank Hamilton, defendant BRYAN ELON JACKSON applied for a PPP loan for his non-operational shelf company Gallio, with the intent of filing for loan forgiveness in the future. Defendant JACKSON's application falsely stated that Gallio's average monthly payroll was approximately $103,431 and the company had 13 employees. Gallio had no actual employees. The purpose of the loan was marked as payroll, lease, and utilities, but Gallio had no payroll, no lease, and no need for utilities.

52. On or about May 12, 2020, defendant BRYAN ELON JACKSON received a PPP loan of approximately $255,577 from Cross River Bank for his non-operational shelf company Gallio.

19

53.     On or about May 22, 2020, as part of the conspirators' plan to apply for loan forgiveness, Frank Hamilton sent an email to defendant BRYAN ELON JACKSON attaching a payroll schedule that listed other conspirators and/or the companies owned by conspirators, including Frank Hamilton, Edwin Bonilla, Joseph Greco, Tina Chen, Timothy Park, and Kenny Tran, as well as scheduled amounts, in order to provide defendant JACKSON with back-up documentation for a Gallio loan application that would falsely claim that Gallio had employees and the loan funds would be used for payroll purposes.

54.     From in or about April through June 2020, defendant BRYAN ELON JACKSON's name and/or the names of his companies Gallio and Medi Core were used or provided to prepare false backup documents for applications submitted for PPP loans by co-conspirators Frank Hamilton, Michael Jones, Joseph Greco, Tina Chen, Kenny Tran, and Timothy Park.  Defendant JACKSON did not work for any of those individuals or their companies.

55.     In or about June 2020, defendant BRYAN ELON JACKSON sent Frank Hamilton's company Historic Concepts multiple payments totaling approximately $155,146.80, falsely designating the funds as payroll.  The goal was to provide the false appearance that PPP funds received by the conspirators were being used for payroll, as required by the terms of the PPP loans, by making it appear that Hamilton's company was being used to pay employees. There were no employees to pay, however, and the plan was for Hamilton to hold the money in his account until the conspirators' PPP loans were forgiven.

56.     On or about May 23, 2022, defendant BRYAN ELON JACKSON applied for forgiveness for Gallio's PPP loan in which he falsely claimed that funds from the Gallio PPP

20

loan were used to pay employees.  The forgiveness application was denied.  On May 2, 2023, defendant JACKSON had an unpaid balance of approximately $230,388 on his PPP loan, as only one payment of approximately $25,188 had been made on or about June 13, 2022.  On or about May 19, 2023, the loan defaulted, and the SBA had to pay the guarantee to the bank for the loan.

*EIDL Loans*

57.     From on or about April 6, 2020, through on or about April 14, 2020, consistent with the plan that the conspirators' companies would be used to apply for EIDL and EIDL advance loans, after which the loan proceeds would be transferred to Frank Hamilton, who would retain the proceeds and make all loan payments, Hamilton and Co-conspirator A caused a total of approximately 11 successful EIDL and EIDL advance loan applications to be filed for companies owned by participants in the conspiracy, including defendant BRYAN ELON JACKSON's companies Gallio and Medicore, as well as companies owned by conspirators Michael Jones, Peter An, Edwin Bonilla, Tina Chen, Joseph Greco, Timothy Park, and Kenny Tran.

58.     Defendant BRYAN ELON JACKSON and Co-conspirator A, Frank Hamilton, Michael Jones, Kenny Tran, Timothy Park, Tina Chen, Edwin Bonilla, Joseph Greco, Peter An, and other conspirators caused the transmission by means of wire communication in interstate and foreign commerce signals and sounds in multiple ways, including (i) interstate phone calls, emails, use of the internet, and wire transfers of funds, (ii) the transmission of fraudulent applications and documents pertaining to loan applications made by co-conspirators Tran and Park by interstate wire in or about May and June 2020 from California to Customers Bank in the Eastern District of Pennsylvania, and (iii) funds wired by Customers Bank in the

21

Eastern District of Pennsylvania in or about May and June 2020 to accounts controlled by Tran and Park in California.

59.   On or about the following approximate dates, defendant BRYAN ELON JACKSON, Co-conspirator A, Frank Hamilton, Michael Jones, Kenny Tran, Timothy Park, Tina Chen, Joseph Greco, Edwin Bonilla, Peter An, Leslie Murray, Le Chu Valdivia, and other conspirators submitted and aided and abetted the submission of fraudulent applications for approximately $9,441,553 of loans by means of wire communications in interstate commerce, to the financial institutions and lenders listed below on behalf of the purported companies listed below, knowing that these applications falsely stated the length of time the businesses were functioning, and that the companies had revenues, expenses, employees, and payroll that they did not have, and contained false documents and false answers to lenders questions:

|  | Company | Lender | Loan Type | Appx. Date | Funded | Appx. Amount |
|---|---|---|---|---|---|---|
| **BRYAN JACKSON** | **Gallio** | Celtic Bank | 7(a) | 8/11/2017 | Yes | $150,000 |
| **BRYAN JACKSON** | **Medi Core** | First Home Bank | 7(a) | 12/7/2018 | Yes | $243,405 |
| **BRYAN JACKSON** | **Medi Core** | SBA | EIDL + Advance | 4/7/2020 | Yes | $125,400 |
| **BRYAN JACKSON** | **Gallio** | Cross River Bank | PPP | 5/12/2020 | Yes | $258,577 |
| **BRYAN JACKSON** | **Medi Core** | Kabbage/ First Home Bank | PPP | 5/28/2020 | No | $296,028 |
| An | Authora | Cross River Bank | PPP | 5/6/2020 | Yes | $467,640 |
| Bonilla | Domino Group | SBA | EIDL + Advance | 4/14/2020 | Yes | $160,000 |
| Bonilla | Domino Group | Cross River Bank | PPP | 5/8/2020 | Yes | $239,730 |
| Chen | Minnow | Bancorp | 7(a) | 11/13/2019 | Yes | $350,000 |

|  | Company | Lender | Loan Type | Appx. Date | Funded | Appx. Amount |
|---|---|---|---|---|---|---|
| Chen | Definito | SBA | EIDL + Advance | 4/7/2020 | Yes | $91,600 |
| Chen | Minnow | SBA | EIDL + Advance | 4/9/2020 | Yes | $111,600 |
| Chen | Definito | Celtic Bank | PPP | 5/4/2020 | No | $257,200 |
| Chen | Minnow | US Bank | PPP | 6/30/2020 | Yes | $237,117 |
| Greco | Aprise | SBA | EIDL + Advance | 4/14/2020 | Yes | $159,000 |
| Greco | Aprise | Cross River Bank | PPP | 5/14/2020 | Yes | $258,262 |
| Hamilton | *Nubela* | First Home Bank | 7(a) | 3/7/2018 | No | $268,000 |
| Hamilton | *Nubela* | Bank of America | PPP | 4/3/2020 | Yes | $416,624 |
| Hamilton | BMG | Cross River Bank | PPP | 5/4/2020 | Yes | $257,832 |
| Hamilton | Historic Concepts | Cross River Bank | PPP | 5/6/2020 | Yes | $252,467 |
| Hamilton | KLMN | Cross River Bank | PPP | 5/13/2020 | Yes | $363,536 |
| Jones | Foxtrot Systems | First Home Bank | 7(a) | 10/16/2019 | No | $200,000 |
| Jones | Foxtrot Systems | SBA | EIDL + Advance | 4/10/2020 | Yes | $118,600 |
| Jones | Foxtrot | Celtic Bank | PPP | 5/7/2020 | Yes | $259,020 |
| Jones | Foxtrot | Northeast Bank | PPP (2nd) | 2/22/2021 | Yes | $249,707 |
| Murray | Xoom-Asset Management | Cross River Bank | PPP | 4-30-2020 | Yes | $237,115 |
| Murray | Zoom-Asset Management | SBA | EIDL | 4-6-2020 | No | $150,000 |
| Co-conspirator A | Guardian Angel | Celtic Bank | PPP | 5/5/2020 | Yes | $ 87,710 |
| Co-conspirator A | Guardian Angel | Northeast Bank | PPP (2nd) | 2/5/2021 | Yes | $104,166 |
| Co-conspirator A | Sole Prop. | Non-bank Fountainhead | PPP | 3/10/2021 | Yes | $20,104 |

|  | Company | Lender | Loan Type | Appx. Date | Funded | Appx. Amount |
|---|---|---|---|---|---|---|
| Co-conspirator A | Sole Prop. | Non-Bank Fountainhead | PPP (2nd) | 4/12/2021 | Yes | $20,104 |
| Park | Tiburon | First Home Bank | 7(a) | 4/3/2019 | Yes | $250,000 |
| Park | Boostmore | SBA | EIDL + Advance | 4/7/2020 | Yes | $99,900 |
| Park | Tiburon | SBA | EIDL + Advance | 4/7/2020 | Yes | $99,900 |
| Park | Tiburon | Celtic Bank | PPP | 5/5/2020 | No | $529,940 |
| Park | Boostmore | Customers Bank | PPP | 5/17/2020 | Yes | $245,888 |
| Park | BME | Cross River Bank | PPP | 5/18/2020 | Yes | $229,252 |
| Tran | Hornet | West Town Bank | 7(a) | 9/21/2019 | Yes | $180,000 |
| Tran | Hornet | SBA | EIDL + Advance | 4/9/2020 | Yes | $129,500 |
| Tran | Trans Logistics | SBA | EIDL + Advance | 4/13/2020 | Yes | $153,000 |
| Tran | Hornet | Cross River Bank | PPP | 5/18/2020 | Yes | $253,257 |
| Tran | Trans Logistics | Customers Bank | PPP | 5/26/2020 | Yes | $304,313 |
| Valdivia | Citizo | First Home Bank | 7(a) | 2/16/18 | Yes | $200,000 |

All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violation of Title 18, United States Code, Section 1349, set forth in this information, defendant

**BRYAN ELON JACKSON**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds obtained directly or indirectly from the commission of such violation.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.

Christine & Agu for
_____
**DAVID METCALF**
**UNITED STATES ATTORNEY**

25

*No.*_ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

BRYAN ELON JACKSON

INFORMATION

Counts

**18 U.S.C. § 1349 (wire fraud conspiracy – one count)**
**Notice of forfeiture**

A true bill.

_____
Foreperson

Filed in open court this _____day,
Of _____A.D. 20_____

_____
Foreperson

Bail, $_____